IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Crim. No.  CR-08-360 (RMU) |
| PAUL A. SLOUGH, ) | |
| NICHOLAS A. SLATTEN, ) | Judge Ricardo M. Urbina |
| EVAN S. LIBERTY, ) | |
| DUSTIN L. HEARD, ) | |
| DONALD W. BALL, ) | |
| ) | |
| **Defendants.** ) | |

**DEFENDANTS' REPLY MEMORANDUM
IN SUPPORT OF THE MOTION TO COMPEL
THE PRODUCTION OF *BRADY* MATERIAL**

The Government's Opposition to the defendants' Motion to Compel the Production of *Brady* Material [Document 114] (hereafter, "Opposition") confirms that the Government does not understand its obligations under the due process clause, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963), and subsequent cases.  The Opposition contains three sentinel misunderstandings of *Brady*:

- First, the Government seems to believe that *Brady* allows the Government to suppress *some* evidence favorable to the accused as long as it can point to other favorable evidence that has been disclosed.  That is, of course, not the law.  On the contrary, "'the government is obligated to disclose *all* evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case.'"  *United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) (quoting *United States v. Safavian*, 233 F.R.D. 12, 17 (D.D.C. 2005)) (emphasis added).

- Second, the Government seems to believe that it can avoid a disclosure otherwise required by *Brady* if it can articulate some theory of liability on which a jury would ultimately be entitled to find the defendants guilty; or in other words, that evidence need not be deemed "favorable" under *Brady* unless it is *absolutely inconsistent with conviction on any legally viable basis.* That, again, is not the law, as the facts of *Brady* itself make quite clear.

- Third, the Government seems to believe that evidence favorable to one defendant may be knowingly withheld from that defendant if there are any co-defendants as to whom the evidence would *not* be favorable. That, once again, is also not the law. *Brady* disclosures are required because of each individual defendant's constitutional right to a fair trial. The Government may not sacrifice one defendant's constitutional rights in order to preserve a mere tactical advantage versus a co-defendant.

In Part I of this Reply, defendants Paul Slough, Nicholas Slatten, Evan Liberty, Dustin Heard, and Donald Ball address the three evident defects in the Government's understanding of *Brady*. In Part II, we reply to the Government's fact-specific arguments about the four categories of *Brady* material discussed in our original Memorandum of Points and Authorities.[1]

---

[1] *See* Defendants' Memorandum of Points and Authorities in Support of the Defendants' Motion to Compel the Production of *Brady* Material [Document 104-2] (hereafter, "Def. *Brady* Mem."), at 14-25; *see also* Attachment A to Def. *Brady* Mem. The four categories included (a) evidence that tends to identify a particular alleged shooter for any alleged victim (and therefore tends to rule out four or even five of the defendants as possible shooters); (b) evidence that tends to cast doubt upon whether the alleged victims named in the Indictment were in fact killed or wounded in Nisour Square on September 16, 2007, by the defendants or by anybody else; (c) evidence that tends to establish grounds for the defendants' subjective beliefs about potential security threats in Baghdad at the time of the Nisour Square incident; and (d) evidence that tends to establish the existence of actual security threats in Baghdad.

**ARGUMENT**

I. **THE GOVERNMENT'S OPPOSITION RESTS ON THREE FUNDAMENTAL MISUNDERSTANDINGS ABOUT *BRADY*.**

   A. **Partial Disclosure of *Brady* Material Does Not Excuse Withholding of Other *Brady* Material.**

Virtually every page of the Opposition that addresses *Brady* issues notes that the Government has already produced many pages of documents. However, the Government repeatedly evades the critical question, which is whether the Government is currently withholding *additional* evidence that the defendants have a constitutional right to receive under *Brady*. On this critical question, the Opposition continues the frustrating pattern that appears in the Government's previous correspondence on *Brady* issues: The Government claims that it has no obligation to disclose the evidence in question, and then discloses some evidence anyway, while remaining silent about whether there is more evidence that is being withheld.

For example, in the prosecutors' July 24, 2009 letter to defense counsel, they write, "Several U.S. Government contractors were in the vicinity of Nisur Square at the time of the shooting. *Although we are not required to do so,* we hereby provide you with the names of those contractors . . . ."[2] They then proceed to disclose that the U.S. contractors who were in Nisour Square at the time of the shooting told investigators that they heard multiple bursts of AK-47 fire, observed tactics typically associated with anti-U.S. insurgents in Iraq, and saw men in Iraqi police uniforms firing toward the defendants' convoy.[3] There is, quite simply, no non-frivolous argument that *Brady* permits the Government to withhold this evidence, yet the Government insists even while disclosing this evidence that it is "not required to do so."

---

[2] Letter from K. Kohl, J. Malis, and S. Ponticiello to M. Hulkower *et al.*, (July 24, 2009), at 6 (emphasis added).

[3] *Id.* at 6-7.

The problem with this approach is that it makes it impossible for the defendants ever to know whether they have *all* the evidence to which they are entitled, or only so much of it as the Government deigns to disclose "out of an abundance of caution."[4]  The Government has now provided at least *some* exculpatory evidence about the hostile fire under which the defendants found themselves—albeit seven months after indictment.[5]  But if the Government's explicit insistence that the disclosure is "not required" means anything, it means the defendants are on notice that the Government may be withholding other information of the same kind; otherwise the "not required to do so" language is pointless bravado, particularly where such obviously exculpatory material is concerned.

The same pattern unfortunately appears throughout the Government's Opposition.  For example, the defendants' *Brady* motion argued at some length that the defendants are entitled to all information in the Government's possession, custody, or control regarding actual and threatened insurgent activity both at Nisour Square and in Baghdad more generally.  Def. *Brady* Mem. at 21-25.  In its Opposition, the Government's *only* response to the defendants' arguments

---

[4] *Id.* at 1.

[5] The timing of the government's *Brady* disclosure is more troubling than the paucity of the material provided.  As mentioned above, on July 24, 2009, nearly seven months after the indictment, the government identified 17 Iraqi *Brady* witnesses and four non-Iraqi *Brady* witnesses who may still be in Iraq.  The contact information for these witnesses was not disclosed until almost two weeks later.  It is readily apparent that Iraq, and Baghdad in particular (which, since the invasion, has been the most dangerous city in the world), has become even more dangerous since June 30, 2009.  On that date, U.S. troops withdrew from Baghdad and other Iraqi cities under a security pact that outlines the American withdrawal by the end of 2011.  Since then, a wave of violence has washed over Baghdad and other Iraqi cities.  Just this week, the *New York Times* reported that insurgents launched a coordinated attack of vehicle-borne improvised explosive devices throughout Baghdad, as American soldiers stood by helplessly.  Ninety-five people were reportedly killed and 600 were said to be injured.  One of the truck bombs exploded close to the Green Zone and another less than three miles away.  Before June 30, following up with these *Brady* witnesses would already have been a Herculean task.  Given the escalating violence, the late disclosure of *Brady* material by the Government has made that task almost impossible.

4

on this point is that "documents responsive to these requests have been already been [*sic*] produced in classified discovery in the form of the 88 pages of intelligence briefing notes of [a Blackwater analyst], and the 324 pages of PSD Intelligence Update daily reports for the time period from September 1-16, 2007." Opposition at 22. The Government does *not* argue that, as a matter of law, information about insurgent activity falls outside the Government's *Brady* obligation. Nor does the Government represent, as a matter of fact, that it possesses no further information about insurgent activity in or around Nisour Square. It simply states that certain responsive documents have been produced, without offering either a legal justification for withholding similarly favorable evidence or a factual representation that no similarly favorable evidence exists.

Until recently, it has been common for courts to accept assurances from the Government that it understands its *Brady* obligations and intends to comply. But recent cases here and elsewhere have called into question whether the Government understands its *Brady* obligations after all. And once the prosecution has gone so far as to claim that it is *not required to disclose the identities of eyewitnesses who say the defendants were under attack* at the time of the shooting, the only conceivable way to protect the due-process rights of the defendants is with an order from the Court closing the various "not required to do so" loopholes that the Government's representations to date have left open.

> B.   **The Government's Novel Theories of Group Criminality Have No Bearing on the Scope of Pretrial Disclosures Required by *Brady*.**

Remarkably, the Government argues that in a prosecution of Defendant A for the shooting death of Victim V, evidence that A did *not* shoot V "do[es] not constitute exculpatory material." Opposition at 27. According to the Government's reasoning, evidence that A did not shoot V is not exculpatory because the Government has no obligation to prove that he did.

5

Instead, in what appears to be a preview of the theory it will advance at the Rule 29 stage, the Government argues at some length that it may send the five defendants to prison for decades merely by proving that they played a role in creating a "hail of bullets." Opposition at 28.

There are a number of very serious problems with the Government's reliance on *Roy v. United States*, 871 A.2d 498, 507 (D.C. 2005), for the proposition that the defendants here can be convicted as principals on an "urban gun battle" theory. To begin with, it is foolish to pretend that Baghdad is just like Washington. The joint defendants in *Roy* were charged with the death of a bystander killed by a stray bullet while the defendants were fighting each other with illegal handguns on a D.C. street. The trial court instructed the jury that the defendants were criminally responsible for all foreseeable consequences of their gun battle if they were "armed and prepared to engage in a gun battle," 871 A.2d at 506 n.8. The Court of Appeals approved of this instruction, reasoning that "an individual's participation in such a battle represents a depraved indifference to human life such that he or she meets the *mens rea* for second-degree depraved heart murder." 871 A.2d at 507 n.10. But this reasoning does not hold when the context shifts from D.C. to Baghdad. For the Nisour Square defendants, being "armed and prepared to engage in a gun battle" does not signify a "depraved indifference to human life"; it signifies that these young men were part of a diplomatic security detail in the middle of a combat zone. For the defendants in our case, being "armed and prepared to engage" was a mandatory part of the service they rendered the United States. For the *Roy* defendants, mere possession of a handgun was a crime.

Furthermore, it was not these five defendants who commenced hostilities in Iraq; it was the Government. It was the Government that invaded Iraq, the Government that established the conditions that have allowed the anti-U.S. insurgency to flourish, and the Government that hired

6

these men to protect U.S. diplomats from the resulting conditions of extreme violence. For that same Government to compare its own hired security force to street thugs in an illegal handgun battle in D.C. is both frivolous and reprehensible.

But while that is the most outrageous problem with the Government's reliance on *Roy*, there is another that is more fundamental to the *Brady* issue: Quite simply, it does not matter *at this stage* whether the Government's "urban gun battle" theory is valid or not—that question may have to wait for a Rule 29 motion. The question *at this stage* is not whether it will be possible to convict Defendant A without proving that he shot Victim V, but whether evidence suggesting that Q actually shot V should be considered favorable to A's defense. Obviously— we cannot believe we have to spell this out—evidence that Q shot V helps A defend against the charge that A shot V, particularly if there is no evidence that A assisted Q in any way. It even helps A defend himself against the charge that V was killed by some indivisible "hail of bullets," because it identifies at least one victim whose actual killer is known, and thereby narrows the range of matters about which the Government invites the jury to speculate. Because this evidence is favorable to A, it must be disclosed under *Brady*, no matter what the Government may later argue about the weight or interpretation of that evidence.

Nor do the Government's "aiding and abetting" cases help, for as we noted in the Defendant's Memorandum, the aiding and abetting theory raises factual questions that make the requested *Brady* disclosures more necessary rather than less. In the *least demanding* formulation cited by the Government, a conviction for aiding and abetting will require the Government to prove "some affirmative participation which at least encourages the principal offender to commit the offense, with all its elements, as proscribed by the statute." *United States v. Kelly*, 552 F.3d 824, 831-32 (D.C. Cir. 2009) (internal citations omitted). Thus, even as to "aiding and abetting"

7

liability, the identification of a particular person as the shooter means that each defendant gets to face the charge that he affirmatively encouraged the shooter to commit voluntary manslaughter, instead of the charge that he was "armed and prepared to engage" when a "hail of bullets" somehow erupted and killed 14 people. Evidence that can affect the case that substantially is unquestionably "favorable" under *Brady*.

Notably, the government does not contend that it possesses no evidence differentiating the roles of the various defendants and Mr. Ridgeway in the alleged shootings. Rather, it states that based on the lack of forensic evidence in the case, "there is no way to determine *conclusively* who fired the fatal shot or shots that killed a particular victim or who fired the shot or shots that wounded a particular victim." Opposition at 26 (emphasis added). But *Brady* does not require production of exculpatory evidence only when it is "conclusive." Presumably, if the government possessed "conclusive" evidence that these defendants did not fire the fatal or wounding shots, the prosecutors would have an ethical obligation to terminate this prosecution.

In addition, *Brady* is not limited to forensics or physical evidence. The Government must also disclose witness statements containing favorable or exculpatory evidence. *See Kyles v. Whitley*, 514 U.S. 419 (1995). Thus, for instance, if the Government currently possesses a witness statement saying that Jeremy Ridgeway alone shot a particular person named in the indictment as the convoy was leaving Nisour Square, that witness statement is exculpatory as to all five defendants because it tends to suggest that he acted without the assistance or encouragement of any of them. It would certainly be exculpatory evidence as to defendants who did not ride with Ridgeway, and whose vehicles were ahead of Ridgeway's and may well have been out of Nisour Square when that shooting occurred.

Calling what happened in Nisour Square a "hail of bullets" may be the Government's trial strategy for explaining to the jury why it cannot prove who killed whom that day. But at the *Brady* stage, it does not excuse the Government from revealing the numerous exculpatory facts it *does* know, and turning over exculpatory evidence that it actually possesses.

    **C.**    **The Government May Not Withhold *Brady* Material for Tactical Advantage.**

As if to underscore just how lightly it regards its *Brady* obligations, the Government argues that it may withhold otherwise exculpatory evidence from Defendant A if that evidence is not similarly exculpatory for all four of A's co-defendants. Opposition at 30. The Government cites no case adopting this theory, nor should we expect to see one as long as the Due Process Clause remains in force. Indeed, the mere fact that the Government makes this argument is profoundly disappointing.

The requirements of *Brady* have a constitutional pedigree. If there is any piece of evidence that is favorable to Defendant A, then A is *constitutionally entitled* to have that evidence, regardless of whether anyone else is similarly entitled. The Government proposes to suppress the evidence to which A is constitutionally entitled in order to preserve a purely tactical and decidedly non-constitutionally-based advantage—the element of surprise—versus Defendant B. There is, of course, no possible theory on which the constitutional rights of one criminal defendant may be sacrificed to give the prosecutor a better chance of convicting another. Indeed, many published decisions deplore the prosecutorial mindset that would elevate tactical advantage over the bedrock constitutional guarantee of a fair trial, beginning with *Brady* itself.[6]

---

[6] *E.g.*, *Brady*, 373 U.S. at 87-88:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. . . . A prosecution that withholds evidence on demand of an

9

The Government objects that "such a rule would effectively force the [G]overnment to disgorge its files to the entire defense team, on the pretense that the inculpatory material as to the lead defendants is exculpatory as to the remaining defendants." Opposition at 30. But that objection incorrectly assumes that the Government is *required* to try all five defendants together. If there is a *constitutional* way for the Government to preserve the element of surprise at trial against Defendant B, it is not to withhold *Brady* material from A, but rather to try A and B separately. By contrast, the Government asks this Court to rule that the Government may try all defendants together on a "hail of bullets" theory that considers their guilt or innocence only as a group rather than as individual defendants, even though *the Government itself* believes that undisclosed evidence makes some defendants more culpable than others. That is inconsistent with *Brady*, and with the fundamental fairness that we rightly regard as the first requirement of any trial in the United States.

## II. THE GOVERNMENT MUST PRODUCE *BRADY* MATERIAL IN ALL FOUR CATEGORIES DISCUSSED IN THE MOTION.

The defendants' Motion to Compel set forth four broad categories of defense requests that the Government has rejected: (A) evidence that tends to identify a particular shooter for any alleged victim (and therefore tends to rule out four or even five of the defendants as possible shooters) (*Brady* Req. Nos. 2, 6, 7, 18, 21, 23, 24 & 25); (B) evidence that tends to cast doubt upon the Government's allegations about whether the people named in the Indictment were in fact killed or wounded in Nisour Square on September 16, 2007, by the defendants or by anybody else (*Brady* Req. No. 32); (C) evidence that tends to establish grounds for the

---

> accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . .

defendants' subjective beliefs about potential security threats to U.S. interests in Baghdad at the time of the Nisour Square incident (*Brady* Req. Nos. 45, 46, 58); and (D) evidence that tends to establish the existence of actual security threats to U.S. interests in Baghdad at the time of the Nisour Square incident, (*Brady* Req. Nos. 8, 34, 35, 36, 66). Having illuminated the errors in the Government's understanding of *Brady*, we can deal more briefly with the Government's factual arguments about these four categories.

### A.     Identities of Shooters

Significantly, the Government admits that it "possesses witness accounts that describe who was firing at various times and in various directions." Opposition at 27. Because some of the defendants were riding in different vehicles, which were in different parts of Nisour Square at different times, such evidence will by its nature point toward some possible shooters and away from others. The alleged victims, too, were in different places throughout Nisour Square at different times. To the extent the witness statements withheld by the Government tend either to rule out any defendant as the shooter of a particular victim, or to demonstrate a diminished opportunity for any defendant to "aid and abet" the shooter, those statements are exculpatory and they must be disclosed under *Brady*.

The Government complains in its Opposition that the defendants cited no case authority for this proposition, but in fact we cited *Brady* itself, which involved a felony murder conviction of a non-shooting defendant. *See* Def. *Brady* Mem. at 15-16. Virtually all of the arguments made by the Government to avoid its *Brady* obligation here would apply with equal force to *Brady* itself. Even on the narrowest possible reading, *Brady* holds that the Government may not suppress evidence of the actual shooter's identity while attempting to convict someone else of the shooting.

11

B.     **Uncharged Victims**

The Opposition's discussion of this category of information is puzzling. On the one hand, the Government does not expressly argue that anything requested by the defense falls outside *Brady*, as it argues with respect to the shooters' identities. But at the same time, the Opposition parses the defense team's specific requests fairly minutely, Opposition at 22-23, even though *Brady* requires disclosure of exculpatory evidence whether the defense asks for it or not. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Agurs*, 427 U.S. 97 (1976)). In addition, the Government concludes its discussion of this issue with a series of statements so carefully hedged and qualified that one can hardly help wondering exactly what the Government is working so hard *not* to say. Opposition at 23-24. And taking all the Government's statements together with the reports already disclosed to the defense, the defendants are still left without any evidence at all on the reason why the indictment alleges 14 dead and 20 wounded whereas contemporaneous government reports concluded that there were 17 dead and "11 or more" wounded. Perhaps we are too suspicious, but it is very hard to believe that the Government knows nothing at all about how the number of dead was revised downward and the number of wounded was revised upward.

The Government seems to have chosen to construe each of our requests narrowly and place the burden on the defense to "ask the right question." But the Government's obligation to disclose favorable evidence is independent of any request by the defense, and any evidence of conflict in the numbers of killed and wounded in Nisour Square is favorable because it casts doubt on the most basic facts alleged in the indictment. We hope the Court will make clear that the Government, when faced with the question of whether to disclose further information on that subject, should "resolve doubtful questions in favor of disclosure." *United States v. Agurs*, 427 U.S. 97, 108 (1976). *See also Cone v. Bell*, 129 S. Ct. 1769, 1783 n.15 (2009) ("As we have

12

often observed, the prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure."); *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) ("a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence").

### C. Threats at Nisour Square and General Threats

The Government's protest that it has already produced *some* information responsive to these requests (Opposition at 22) is insufficient, for the reasons stated in Part I.A above. *Brady* entitles the defendants to *all* exculpatory evidence. To the extent the evidence becomes cumulative and the production becomes burdensome, defense counsel will obviously be happy to agree to reasonable limitations on production—after inspection. But before any such limitations can be negotiated, it must be crystal clear that the category of evidence in question is indeed *Brady* material, so that defense counsel can at least be permitted to see or at least know about the evidence that is ostensibly too burdensome and cumulative to produce.

In addition, we note with interest the Government's statement that it has already given the defendants all "*physical* evidence . . . suggesting that anyone other than the defendants fired their weapons at Nisur Square on September 16, 2007." Opposition at 21 (emphasis added). As set forth above, *Brady* is not limited to physical or forensic evidence, and witness statements have specifically been held to be *Brady* material. *Kyles v. Whitley*, 514 U.S. 419 (1995). Consequently, it may be necessary for the Court to instruct the Government on this point as well, and order the disclosure of all witness statements pertaining to security threats in and around Nisour Square.

### CONCLUSION

The Government is clearly attempting to prosecute the five defendants as an undifferentiated group. But each defendant is a young man whose guilt or innocence must be determined based on what he himself did on September 16, 2007. Each of those young men has

a constitutional right to know about every piece of evidence that has any tendency to contradict the charges against him.

The time for scrutinizing the Government's theory of group criminality will come, but for now the question is simply one of disclosure under *Brady*. For the foregoing reasons, the Court should order the Government to disclose all exculpatory information within its possession, custody, or control, including without limitation the four categories of information discussed above.

Dated: August 21, 2009

Respectfully submitted,

　　/s/ Thomas Connolly　　
Thomas G. Connolly
Steven A. Fredley
WILTSHIRE & GRANNIS LLP
1200 Eighteenth St., N.W.
Washington, D.C. 20036
Telephone: (202) 730-1300
Facsimile: (202) 730-1301
Email: tconnolly@wiltshiregrannis.com
Email: sfredley@wiltshiregrannis.com

*Counsel for Nicholas Slatten*

　　/s/ Mark Hulkower　　
Mark Hulkower
Michael Baratz
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 429-6221
Facsimile: (202) 429-3902
Email: mhulkower@steptoe.com
Email: mbaratz@steptoe.com

*Counsel for Paul Slough*

　　/s/ David Schertler　　
David Schertler
Danny Onorato
SCHERTLER & ONORATO, L.L.P.
601 Pennsylvania Avenue, NW
North Building-9th Floor
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
Email: dschertler@schertlerlaw.com
Email: donorato@schertlerlaw.com

*Counsel for Dustin Heard*

| | |
|---|---|
| /s/ William Coffield | /s/ Steven McCool |
| William F. Coffield | Steven McCool |
| COFFIELD LAW GROUP LLP | MALLON & MCCOOL, LLC |
| 1330 Connecticut Ave., N.W., Suite 220 | 1776 K Street, N.W., Suite 200 |
| Washington, D.C. 20036 | Washington , DC 20006 |
| Telephone: (202) 429-4799 | Telephone: (202) 680-2440 |
| Email: wcoffield@coffieldlawgroup.com | Facsimile:  (410) 727-4770 |
| | Email: smccool@mallonandmccool.com |
| *Counsel for Evan Liberty* | *Counsel for Donald Ball* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August 2009, I caused the foregoing Defendants' Reply Memorandum in Support of the Motion to Compel the Production of *Brady* Material to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

Kenneth C. Kohl
Jonathan M. Malis
United States Attorney's Office
for the District of Columbia
555 Fourth St., NW
Washington, D.C. 20530
Ken.Kohl@usdoj.gov
Jonathan.M.Malis@usdoj.gov

    /s/ Thomas Connolly
Thomas G. Connolly
WILTSHIRE & GRANNIS LLP
1200 Eighteenth St., N.W.
Washington, D.C. 20036